JUDGE CAPRONI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**14 CV 3885**

| | |
|---|---|
| G31000 NORTH AMERICA, INC., ALLEN GLUCK , and ALEXIS DALI, | Civil Action No.: |
| Plaintiffs, | **COMPLAINT** |
| -against- | DEMAND FOR JURY TRIAL |
| CHRISTOPHER M. PARIS AND OXEBRIDGE QUALITY RESOURCES INTERNATIONAL, LLC. | |
| Defendants. | |



JUDGE CAPRONI

Plaintiffs G31000 North America, Inc., Allen Gluck, and Alexis Dali by and through their attorneys Garson, Ségal, Steinmetz, Fladgate LLP for their Complaint against Defendants, Christopher M. Paris and Oxebridge Quality International, LLC, on knowledge as to their own acts and otherwise on information and belief as follows:

## PRELIMINARY STATEMENT

1. This is an action for compensatory, declaratory and injunctive relief pursuant to, *inter alia,* the Declaratory Judgment Act, 28 U.S.C. ara201, brought by Plaintiffs G31000 North America, Inc. ("G31000"), Allen Gluck ("Gluck"), and Alexis Dali ("Dali" or "Alex") to enjoin the continued cyber libel and business torts by

1

Christopher Paris ("Paris") and Oxebridge Quality Resources International, LLC, ("Oxebridge").

2. Plaintiffs are engaged in the risk management industry with a specific concentration in the ISO 31000 method, an international standard for risk management adopted as national risk management standard in the USA, as ANSI/ASSE/ISO 31000, whereas upon information and belief the Defendants consult primarily in ISO 9001 method, an international management system standard for quality management.

3. At all times hereinafter, G31000, as a not for profit corporation, hosts conferences, coordinates educational programs, and participates in discussion forums raising awareness on the ISO 31000 standard.

4. Upon information and belief and at all times hereinafter-mentioned Paris both individually and through Oxebridge offers commercial consulting services based on the ISO9001 standards and other ISO management systems standards.

5. Plaintiffs and defendants maintain feature prominently in online industry chatrooms, blogs, discussion forums and websites. All of which are focus on issues that impact the ISO standard industry and many that are publicly accessible without a subscription.

6. Upon information and belief the defendants are publishers of an Internet website known as www.oxebridge.com (the "Oxebridge Site").

2

7. The heart of the Complaint is derived from Defendants' deliberate course of conduct to besmirch G31000 and its principals primarily via the publication of false statements to the Oxebridge Site or discussions on the business social networking site LinkedIn, with false claims against plaintiff of, *inter alia*, plagiarism, lack of credentials, and violation of FTC rules.

8. Despite knowing or being made aware that the statements are entirely false, Defendants have not retracted their statements or rectified the harm caused thereby.

9. Further, Defendants have targeted Plaintiffs' business associates, partners, sponsors, and clients in order to either divert them from or acquire Plaintiffs' business, by directly sending them the defamatory statements.

10. The pervasive nature of Defendants' conduct demands injunctive relief to staunch the harm.

## PARTIES

11. Plaintiff G31000, is a not for profit corporation formed under the laws of New York with its principal place of business in New York State and is engaged in activity that affects interstate commerce.

12. Plaintiff Gluck is a resident of the State of New York, Rockland County and is one of the Directors of G31000.

13. Plaintiff Dali, is a citizen of Belgium, is resident in Marly-le-Roi near Paris, France and is one of the Directors of G31000.

14. Upon information and belief, defendant Paris, is a resident of the State of Florida, Polk County.

15. Upon information and belief, defendant OxeBridge is a limited liability company formed under the laws of the State of Florida with its principal place of business in Tampa, Florida engaged in activity that affects interstate commerce.

16. Upon information and belief, Paris is the founder and chief executive officer of OxeBridge, and dominates and controls OxeBridge.

## JURISDICTION AND VENUE

17. This Court has original jurisdiction over Plaintiffs' federal unfair competition / trade libel claim pursuant to 28 U.S.C. § 1343(3), subject matter jurisdiction of claims related to the Declaratory Judgment Act, 28 U.S.C. § 2201 and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. This action also seeks to collect for an amount exceeding $75,000 exclusive of interest, costs, or attorneys' fees. In addition, there is complete diversity among the parties and jurisdiction is proper under 28 U.S.C. §1332.

18. Plaintiff seeks Declaratory Relief and Injunctive Relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

19. This court has personal jurisdiction over Defendants because each does business, published the defamatory material, and committed harm within this judicial district Plaintiffs were and will continue to be injured in the State of New York.

20. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) (2) because Plaintiffs reside within this judicial district, and because a substantial part of the events and omissions giving rise to the claims occurred within this judicial district.

## STATEMENT OF FACTS

21. Plaintiffs are engaged in educating and providing certification for those who become knowledgeable in a particular standard for risk management known as ISO 31000:2009, which is a set of principles and guidelines for the risk management industry, adopted as national risk management standard in the USA, as ANSI/ASSE/ISO 31000.

22. ISO 31000 was formulated by the renowned International Standards Organization (ISO), which from its base in Geneva, Switzerland, has published over 19,000 international standards covering all aspects of business and technology across 162 countries.

23. ISO 31000 is a family of standards that was introduced to provide a universally recognized paradigm for risk management. ISO 31000:2009, Risk management –

Principles and Guidelines, provides principles, framework and a process for managing risk. It can be used by any organization regardless of its size, activity or sector.

24. The ISO 31000 standard intends to become the main reference for risk management for all ISO management systems standards that were being used by the relevant organization, including the ISO9001 quality management standard adopted by over one million companies, worldwide. ISO 31000 proposes to redefine the concept of risk to include positive outcomes.

25. G31000 is dedicated to raise awareness on the ISO 31000 standard, organizes events for industry professionals in many different countries and offers its training programs to individuals, corporations and institutions both public and private.

26. One of the core aspects of Plaintiffs' business has been the harnessing and utilization of business social media networking sites / applications such as LinkedIn in which they have built a community of over 36,000 members.

27. The LinkedIn discussion forum is a key component of the Plaintiffs' business model as it provides a platform for interchange of ideas, marketing and promotion, sales of its services and a medium for an authoritative voice in the industry.

28. Both Dali and Gluck are not public figures nor have they sought to become public figures.

6

29. Paris was accepted to be part of the LinkedIn group and became a regular contributor to the threads or discussion topics, while at the same time raising his personal profile promoting Oxebridge.

30. Upon information and belief, neither of the Defendants have any connection with the universities of Oxford or Cambridge as suggested by the name Oxebridge.

### Paris states his intention of causing damage to Plaintiffs

31. Upon information and belief, on or about February 23, 2014 Paris' contributions to one of the LinkedIn groups was considered by Dali, the moderator, to spread false information on the history of the ISO 31000 standard. After receiving a warning, Paris continued to spread additional false information, creating a controversy about the ISO 31000 standard among members. He was then placed under moderation after not responding to a request for explanation and to move a comment to the appropriate topic.

32. In umbrage, Defendants embarked upon a malicious campaign of unlawfully defaming and spreading mistruths about Plaintiffs.

33. The attacks by Defendants are carried out with the stated cause of imposing financial and professional harm on Plaintiffs.

34. Paris made it clear to Dali that he was out to harm Plaintiffs in stating via email "Your comments to me were very expensive. You are just not bright enough to realize it".

35. Paris was bolder in another email by stating "I intend on making sure this costs you money."

36. Paris even gleefully followed with specifics such as "I have advised my aerospace client to seek Risk Management training from another provider. That just cost your, by my estimate, $67,500 in in-house training."

37. An acquaintance of Plaintiffs recently sent an email to Plaintiff making the unfortunate damage clear by "Hi Alex and Allen, I came across these blogs today from Christopher Paris. I wonder if there is any damage limitation possible? They come up on the first page of google search for G31000."

## The Libelous Attacks Have Damaged and Continue to Cause Damage to Plaintiffs

38. The attacks have already caused untold damage to Plaintiffs as Paris' attempts to harm are not limited to publishing libelous statements but he also threatens individuals and businesses around the Plaintiff with the aim of causing them to cut ties with the Plaintiffs.

39. Defendants first began its campaign against Plaintiffs by filing a complaint with professional social media network LinkedIn.com to disrupt one of the core aspects of Plaintiffs' business, namely the community of thousands of members in a G31000 LinkedIn forum.

40. The Plaintiffs have placed substantial resources into forming and maintaining a professional group on LinkedIn. To date, this group has attracted over 35,000 members and is an important part of Plaintiffs' connection with the governments, businesses and individuals that seek to learn about ISO 31000 and may attend Third International G31000 conference scheduled in New York on July 14-15, 2014.

41. Gluck received the following message "We've recently identified suspicious activity in your LinkedIn account. It appears that you may be accessing multiple LinkedIn accounts and/or sharing access to your account. This activity is in violation of the LinkedIn User Agreement. ... As a result, we've suspended your account."

42. Dali's personal LinkedIn account was suspended together with the G31000 LinkedIn group. After protesting to LinkedIn Customer Support, Dali's account was restored after 5 days and LinkedIn justified the drastic action by explaining "LinkedIn has received a claim that alleges infringing, inaccurate, or unlawful content on your profile (...) as your position at Formascope", a claim that Paris initiated based on false information. Paris maliciously presented false information to LinkedIn and caused the group with its public forums and Dali's account to be shut down for days, with no ability to post or respond to messages.

43. As a result, numerous group members reached out to Plaintiffs questioning their inability to post. Paris furthered the damage, by intentionally publishing libelous

statements on multiple, and competing, LinkedIn Forums for ISO 31000 urging members to join the competing group since "LinkedIn had removed the G31000 group" which is in fact the result of Defendants' false claims to LinkedIn. These posts remain on LinkedIn and continue to damage Plaintiffs.

44. The G31000 LinkedIn Forum has since splintered into competing groups and many active posters are no longer participating.

45. As a result of Paris' wantonly libelous assault, Plaintiffs Gluck and Dali were suspended from LinkedIn for five days, an age in the social media world.

### Paris seeks to have Gluck fired from his job
### as a professor at Manhattanville College

46. In another brazen and tortuous action, Paris sought out Gluck's employer attempting to have Gluck dismissed from his adjunct professor position at Manhattanville College, where Gluck teaches risk management.

47. When Gluck was not initially removed, Paris sought to expand his reach to publishing comments about Gluck's employer.

48. Similarly, on or about March 15, 2014 Paris wrote to Manhattanville College "Dr. Davidson, I am writing to report that Mr. Alex Dali, who is listed on the Executive Advisory Council for Manhattanville College's Education & Research Center for Managing Risk, has been found to have plagiarized a number of works. ... I believe you may want to reconsider your institution's affiliation with Mr. Dali." Dali strongly denies these demonstrably false allegations.

49. Upon information and belief, Manhattanville College initially refused to disavow Mr. Dali and Mr. Gluck. Retaliation against Manhattanville by the Defendant was swift in coming on the Oxebridge website, including accusations that Manhattanville has financial interests in supporting the Plaintiffs and including the posting of a photo of the Dean of the College. These posts remain on the Oxebridge site and continue to damage plaintiffs and Manhattanville College. Upon information and belief, rather than fight and court controversy, Manhattanville College and the Dean capitulated to Paris, and Gluck was constructively fired (i.e. his course for the next semester has been assigned to an instructor who has not yet taught this course, or any course in Manhattanville College using the syllabus, which Mr. Gluck has created). Mr. Gluck has undergone three student reviews of his course with results that were all stellar. Without reason, the college has also withdrawn from sponsoring Plaintiffs' conferences after having done so in 2012 and 2013.

50. Manhattanville College stated in response to inquiry from Gluck, regarding Dali's association with Manhattanville College"... we do agree that it would be prudent for you to step down from your role as a member of the EAC at the Manhattanville Center for Managing Risk while your attention is directed towards resolving matters. I hope you agree and will do so voluntarily."

51. The above message from Manhattanville College was a result of the Paris and Oxebridge libel and smear campaign.

## Paris' efforts to damage Plaintiffs by targeting
## corporate sponsorships and conferences attendance

52. As part of their campaign, Defendants have directly and indirectly contacted Plaintiffs' customers, sponsors, affiliates, employees, potential customers, potential sponsors, potential affiliates, and potential employees to spread false and defamatory information about Plaintiffs.

53. In fact, all the libel and inference has caused Plaintiffs' many program presenters to refuse to present in fear of harassment from Paris.

54. A further collateral result of Defendants' attacks have been the participants of Plaintiffs' conferences who are concerned with signing up for fear of being targeted personally. Many conference attendees are public and government officials that are justifiably cautious to the potential for reputational harm that can be caused by Defendants simply for attending a conference presented by G31000. Plaintiffs have thus lost hundreds of thousands of dollars from a drop in conference attendance and sponsorship.

55. Currently, Plaintiffs are concerned with publicizing the names of conference speakers and partners for a conference in New York in July 2014, in order to protect them from Paris' propensity for unwarranted *ad hominem* attacks. At least four of the July 2014 conference speakers have withdrawn or have failed to commit because of a fear of reprisal from Paris.

56. Similarly, Plaintiffs present courses in ISO 31,000 around the world, including recently in Saudi Arabia, Italy, Switzerland, South Africa, China, United Kingdom, Belgium, United Arab Emirates, France, Spain and the USA. As a result of Defendants libel and interference, attendance at these conferences has dropped by 75% or more.

57. Plaintiff Dali, is a contributor to the "Insurance Thought" website, where he publishes multiple articles referring to the ISO 31000 standard. After Defendants' libelous statements wrongly accusing plagiarism, Dali's articles were removed from the website and the website terminated its two year relationship with Dali.

58. In March 2014, a speaker at the Paris 2012 Conference, told Dali that he can no longer speak at the 2014 Conference because of the liability created by Christopher Paris' smear campaign. He elaborated that in his position he could lose his job overnight if he were similarly besmirched.

59. Another longtime G31000 sponsor similarly instructed after being made aware of the recent libelous statement by defendants, that "... my firm does not wish to continue as a partner ..."

60. Another corporate Director of G31000 North America, Inc. similarly reached out to Dali stating "Alex, I have to say that this has really worried me and I have had a few sleepless nights ... or I feel that I will have little choice but to resign as I'm not in a position where I can cope with a significant financial or reputational hit."

61. A government delegation requested assurances from Plaintiffs attorneys in stating "It is critical for the rumor to be nipped 'in the bud' formally and officially or it can cause severe embarrassment for the .. Government ...", "In order to ensure that the matter is being dealt with, may I ask that your attorney's (sic) provide official assurance in writing .... to the allegations raise on LinkedIn.

62. Paris is seeking to capitalize on the libel as evidenced by an email to Dali by an acquaintance that explained, "I have been copied into a number of e-mails that would seem to be pronouncing the death of G31000 and showing an almost indecent haste to step into the breach."

63. All of the aforementioned harms were attributed specifically to Paris and the Oxebridge Site.

64. A partial list of libelous publications by Defendants is laid out below with reference to the place of publication.

65. Paris' Publications in the competing LinkedIn ISO 9001 Group

66. On or about March 1, 2014, within the ISO 9001 group Paris posted variously, "ISO 9001 Gets Infected – – – G31000 to Present at the ISO 9000 Conference", "...Mr. Gluck's fearmongering, which attempts to sell his unaccredited risk manager certificates to the ignorant ISO 9000 crowd. The false subtext: 'if you don't get certified by us, you will fail your ISO 9001 audits.' Utter junk." "Handing the key to the drunk drivers at G31000 will ensure it's quick demise."

67. On or about April 15, 2014, Paris posted variously "Dave, I have exposed the G31000 group as sketchy, not yet the entire ISO 31000 ecosystem. The standard itself isn't bad, it's origins are suspect and it's marketing is horrific, but the standard itself isn't terrible."

### Publications in the LinkedIn ISO 9001:2015 Group

68. On or about April 15, 2014, Paris posted variously "G31000 Risk Management Group - Total Fraud?", "is a scam, operated by a charlatan",

### Publications in the LinkedIn ISO 31000 Group

69. On or about April 25, 2014, Paris posted variously within the ISO 31000 group "The G31000 scandal is becoming widely publicized.", "...and who lack true international industry support", Mr. Gluck's fearmongering, which attempts to sell his unaccredited risk manager certificates to the ignorant ISO 9000 crowd. The false subtext: 'if you don't get certified by us, you will fail your ISO 9001 audits.' Utter junk." "Handing the key to the drunk drivers at G31000 will ensure it's quick demise.". ... If you are fine watching passively while your colleagues have their money stolen, then you are free to remain an observer. I am not fine with that, and elect instead to take action, at great cost to myself and my reputation."

70. On or about April 25, 2014, Paris posted variously "Update on G31000 LinkedIn group (closed)", "It appears the ... group ... was shut down by LinkedIn." "The group's moderator was reported for having at least one, if not two, fake profiles with false information and plagiarized publications. His account was deleted by LinkedIn, and it appears his group was cancelled with him."

## Publications on the Oxebridge Site

71. On or about March 5, 2014, Paris posted on the Oxebridge Site "misleading or false credentials", "what appears to be outright, serial plagiarism", "many members who post are critical of the group", "The LinkedIn group has been the subject of much controversy, due to Mr. Dali's heavy-handed censorship of opposing opinions and banning of those that disagree with him, including at least one of his own moderators", "Searches resulted in no evidence that Mr. Dali has taught as a professor at any university", "his role in 'publication of articles and books' is unclear to untrue", "Mr. Dali has never been published by a third party, with one exception (as we will see)", "The ISBN number  for his book on risk management for RIET Singapore comes up as 'not found'", "His ...PowerPoint presentation ... ISBN number comes up as 'not found' too", "Where he was published by a third party ... – it was plagiarized ... the piece was lifted in total from an article written by Francesca Broadbent ...", "The article ... includes entire sentences which are plagiarized from other works ...", "that Mr. Dali has not been published or recognized by any other major risk management association or trade publication is damning as to his credentials. Initial examination of Allen Gluck's experience with risk management appear to be shallow or nonexistent, with (so far) no verifiable credentials in the discipline."

72. On or about February 27, 2014, Paris posted "Alex Dali, the President of G31000 Global Institute for Risk Management, an international organization dedicated to

cashing in on promoting the ISO 31000 risk management standard...", "G31000 offers $2,700 a pop training classes on risk management, resulting in an unaccredited certification...", "Unable to provide any proof, the G31000 supporters and members instead resorted to their usual tack, of attacking the critic.", "I'm going with the sockpuppet theory, since that fits in with Mr. Dali's proven penchant for spam, exaggerated claims, aggressive salesmanship, and general lack of internet etiquette. (Consider this: the G31000 LinkedIn profiles alleges that the organization has '10,000+ employees.' Sure, they do.) The next question is: why is our industry to plagued with crazies?"

73. On or about March 31, 2014, Paris posted variously "...our ongoing reporting has ... exploded his carefully-crafted facade that the organization is anything but a one-man pipe dream, propped up by exaggerated credentials and outright false claims. ... No one is doing due diligence to find out if these people have actual credentials or experience, and are instead assuming as much based on nothing more than some well-designed pamphlets, and a cool, swishy logo."

74. On or about March 19, 2014, Paris posted variously "The non-vetting of quality professionals ... is toxic for the industry. Right now we see Boeing's Alan Daniels, ANAB's John Knappenberger and a host of other more serious professionals sucking up to the G31000 charlatans Alex Dali and Allen Gluck .... This means that they will have a foothold into future events, and be taken seriously, even though the G31000 group's marketing contains so much false information that they may well be in violation of FTC rules. Nobody vetted them!"

75. On or about February 23, 2014 Paris posted "The notoriously oversensitive folks at G31000 and the ISO 31000 LinkedIn forum didn't take kindly to discussions of risk management, especially the parts where I asked for data or questioned the consensus process ..."

76. On or about April 2, 2014 Paris posted "The website for the G31000 Global Institute of Risk Management has been discovered to be harvesting content from its LinkedIn ISO 31000 discussion group, apparently without permission...", "G31000 appears to stand in multiple violations of the LinkedIn policies..."

77. On or about April 2, 2014 Paris posted on various sites "They have two employees, and no significant risk management experience. The only publications they have claimed authorship of were plagiarized. Nearly every one of their credentials was either exaggerated or entirely fabricated", "Now you can verify yourself, firsthand, the plagiarized materials from Alex Dali's profile. How dandy." , "Mr. Gluck (whose real name is Avrohom Meir Gluck)", "None of the ISBN numbers listed for his publication actually exist", "At least two of the 'partners' listed on the G31000 site never agreed to be listed, and one of those has asked to be removed, and Mr. Dali has refused. This includes Coherent Advice and CRI.",  "Due to irregularities, the entire profile for Mr. Dali and his risk center at Manhattanville College has been taken down, upon investigation by the college's President. That page, too, listed a number of 'advisory council' members that were not actually members, along with false claims under Mr. Dali's biography.", "Mr. Gluck's previous employment contains, at first glance anyway, no experience whatsoever in risk management,

but a history of connections with companies that failed in spectacular manner: MallCall International and Neuromedical Systems as two examples. Previous to that he worked for a now-defunct web design company. Meanwhile, his resume claims only '27 years adult education' which would appear to be entirely inaccurate."

78. On or about May 14, 2014 Paris posted on the Oxebridge site, "Alex Dali is an overflowing font of ridiculousness", "G31000, meanwhile, has no minimum requirements of its attendees", "It also markets its exams as easy", "pushing the idea that it strives to help attendees pass the exam, rather than objectively assess them", "with an additional (undisclosed) exam fee to become a certified "trainer"." "two G31000-branded classes per year, without the financial help or investment of the G31000 group", "Mr. Dali, who (according to reports) flies first class international from France", "cash flows as unethical, rife with conflicts of interest and potentially illegal?

79. Defendant's accusations noted above are false. Had Defendant made even the slightest attempt to carefully read the publically available information as opposed to surmising and creating untruths, they would have known there was no basis for the allegation.

80. Despite notification and many opportunities, Defendant did not publish a retraction correction. Futher notice was obviously useless, given the scenario.

81. In addition to the publishing on Defendants website, the vitriol has spread to other websites as well.

82. When Paris is informed that he has posted false information, he simply responds "Please be aware that we cannot know everything about everything before posting. So mistakes will slip through. You shouldn't attribute that to some nefarious scheme to 'sharing false information.' Consider it… a 'risk' of operating in a public forum. Risks are inevitable, after all … or so I am told."

83. Defendants website and LinkedIn posts remain online and his publications remain available to this date.

84. Defendants' conduct is malicious, intentional, wanton, and reckless, and represents a conscious and total disregard for Plaintiffs' rights. Defendants' conduct caused, and continues to cause, Plaintiffs to be seriously damaged.

85. The allegations - while not formally a crime – are, in the public eye, considered such egregious moral and ethical violations as to constitute libel per se.

86. There is no public interest in the lies spread by Defendant.

87. Plaintiff have no choice but to request relief from this honorable court.

## CLAIMS FOR RELIEF
### COUNT I - Libel

88. Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

89. The Defendant maliciously defamed the Plaintiffs by his knowing publication to third-parties reports containing the fraudulent and false information.

90. Defendant had actual knowledge of the false, inaccurate, and misleading nature of such information and published it despite having such knowledge.

91. The Defendant's actual knowledge of the falsity and reckless disregard for the truth demonstrates his malice and/or willful intent to injure the Plaintiffs.

92. Defendants' statements are defamatory on their face, and expose Plaintiffs to hatred, contempt, ridicule, and obloquy, and/or cause them to be shunned or avoided and tend to injure them in their occupation.

93. Plaintiffs are informed and believe, and based thereon alleges, that Defendants' statements as a whole and each of them were made with knowledge of their falsity or with reckless disregard for their truth or falsity.

94. Plaintiffs are informed and believe, and based thereon alleges, that Defendants' statements as a whole and each of them were made in a grossly irresponsible manner and negligently, with want of due care.

95. Other websites have picked up Defendants' defamatory statements and are running the republications on their online websites as well. Defendants' conduct resulted in the republications, which caused additional and further damage to Plaintiffs.

96. As a direct and proximate result of the above-described conduct by Defendants, Plaintiffs have suffered general and special damages in an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00), including without limitation, damage to Plaintiffs' reputations, careers, and standing in the international business community.

97. Upon information and belief, Defendants' conduct was done with oppression, fraud, and malice and that, therefore, the conduct of Defendants justifies an award of punitive and exemplary damages.

98. Upon information and belief, that unless enjoined and restrained by the Court, Defendant will republish, repeat, and continue to disseminate defamatory statements, all to the continuing injury of Plaintiffs; that such continued republication, repetition, and dissemination of the defamatory and offensive falsehoods will cause irreparable harm to Plaintiffs by further damaging their reputation and adversely affecting their careers and business efforts as well as their personal relationships.

99. Upon information and belief, Plaintiffs lack an adequate remedy at law insofar as damages will be very difficult to calculate for such on-going injuries. By reason of the foregoing, Plaintiffs are entitled to a permanent injunction enjoining and restraining Defendant, and all persons acting in concert with him, from republishing, repeating, distributing, or otherwise disseminating the accusations of plagiarism to the extent such are found by this Court to be false.

100.      Defendants recklessly, maliciously and/or intentionally, published, and disseminated false and inaccurate information concerning Plaintiffs with reckless disregard for the truth of the matters asserted. Defendants' publishing of such false and inaccurate information has severely damaged the personal and consumer reputation of Plaintiffs and caused severe humiliation, emotional distress, and mental anguish to Plaintiffs. Defendant was notified of inaccuracies by Plaintiffs however; Defendant continued to issue and/or publish reports to third parties which contained inaccurate information about Plaintiff. Defendant has, with willful intent to injure and/or maliciously, defamed Plaintiffs.

101.      Defendants reported derogatory, false, inflammatory remarks to others, contrary to the Common Law, and therefore committed defamation and Plaintiffs claims damages therefore.

102.      As a direct and proximate result of Defendant's defamation, Plaintiffs have suffered extreme mental anguish, a loss of reputation, a loss of ability to earn money. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future.

103.      Defendant recklessly, maliciously and/or intentionally, published and disseminated false and inaccurate information concerning Plaintiffs with reckless disregard for the truth of the matters asserted.

104.    Defendants publishing of such false and inaccurate information has severely damaged the personal and consumer reputation of Plaintiffs and caused severe humiliation, emotional distress and mental anguish to Plaintiffs.

105.    Defendant was notified of inaccuracies and problems by Plaintiffs however; Defendant continued to issue and/or publish reports to third parties which contained inaccurate information about Plaintiffs.

106.    Defendant acted with willful intent and malice to harm Plaintiff.

107.    As a direct and proximate result of such conduct, Plaintiffs have suffered actual damages as set forth herein.

108.    Plaintiffs are entitled to an award of punitive damages from Defendants in an amount sufficient to punish them for his conduct as well as to serve as a deterrent to him and to others to prevent the occurrence of such egregious conduct in the future. As a direct and proximate result of such conduct, the Plaintiffs suffered actual damages as set forth herein.

109.    Defendant's acts were malicious, willful, wanton and to the total disregard of Plaintiffs' just rights.

## COUNT II - Common Law Trade Libel or Injurious Falsehood

110.    Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

111.     As described herein, Defendants have published false, defamatory, and disparaging information about Plaintiffs and their business practices.

112.     Defendants' false, defamatory, and disparaging statements were made with actual malice, with reckless negligence, or with reckless disregard of Plaintiffs' rights,

113.     Defendants had no privilege, right, or justifiable cause to publish such statements.

114.     Under these circumstances and as a result of Defendants' conduct, a reasonable person would foresee that third parties, i.e., customers, suppliers, affiliates, employees, potential customers, potential suppliers, potential affiliates, and potential employees, would be deterred from establishing business relationships with, affiliating with, or seeking employment from Plaintiffs or continuing existing relationships with Plaintiffs.

115.     The information published by Defendants has played a substantial and material role in inducing individuals not to establish business relationships with, affiliate with, or seek employment from Plaintiffs.

116.     Plaintiffs have been seriously damaged as a direct and proximate cause of these acts by Defendants, including lost business earnings, donations, affiliations, and spoilage of relationships with employees.

## COUNT III - Federal Unfair Competition (Trade Libel)

117.     Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

118.     As described herein, Defendants have published false, defamatory, and disparaging information about Plaintiffs and their business practices.

119.     Defendants' false, defamatory, and disparaging statements were made with actual malice, with reckless negligence, or with reckless disregard of Plaintiffs' rights,

120.     Defendants had no privilege, right, or justifiable cause to publish such statements.

121.     Under these circumstances and as a result of Defendants' conduct, a reasonable person would foresee that third parties, i.e., customers, suppliers, affiliates, employees, potential customers, potential suppliers, potential affiliates, and potential employees, would be deterred from establishing business relationships with, affiliating with, or seeking employment from Plaintiffs or continuing existing relationships with Plaintiffs.

122.     Plaintiffs have been seriously damaged as a direct and proximate cause of these acts by Defendants, including lost business earnings, affiliations, and spoilage of relationships with third parties.

## COUNT IV - Intentional Interference with Prospective Economic Relations

123.    Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

124.    An economic relationship existed between Plaintiffs and third parties that would have resulted in an economic benefit to Plaintiffs from business related to consulting, conferences, speaking engagements.

125.    Defendants knew of the relationships.

126.    Defendants intended to disrupt the relationships by his aforementioned defamation.

127.    The economic relationships between Plaintiffs and third parties were disrupted.

128.    Defendants' wrongful conduct was a substantial factor in causing Plaintiffs' harm.

## COUNT V - Negligent Interference With Prospective Economic Relations

129.    Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

130.    An economic relationship existed between Plaintiffs and third parties that probably would have resulted in a future economic benefit to Plaintiffs via payment of proceeds from business related to consulting, conferences, educational programs, and speaking engagements.

131.   Defendants should have known of these relationships.

132.   Defendants should have known that these relationships would be disrupted if he failed to act with reasonable care.

133.   Defendants failed to act with reasonable care when they engaged in wrongful conduct through defamation.

134.   The economic relationships between Plaintiffs and third parties were disrupted.

135.   Defendants' wrongful conduct was a substantial factor in causing Plaintiffs' harm.

## DEMAND FOR INJUNCTIVE RELIEF

136.   Granting preliminary and permanent injunctive relief against Defendants, and their agents, servants, and employees, and against any and all persons, firms, or corporations with whom Defendants have acted in concert who receive actual notice of the order by personal service or otherwise, enjoining them from directly or indirectly engaging in any of the illegal, unauthorized, and wrongful acts complained of herein and granting such other injunctive relief which the circumstances may require in order to protect Plaintiffs' interests

137.   Removal of existing publications.

138.   Prominent recanting / correction of all false publications.

## PUNITIVE DAMAGES AGAINST DEFENDANTS

139.     Plaintiffs will show that the acts and/or omissions of Defendants were committed with malice or reckless indifference to the protected rights of the Plaintiff. In order to punish Defendant for engaging in unlawful business practices, and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery from Defendant for punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiffs, by and through their undersigned Counsel, hereby demands a trial by jury of all issues so triable as a matter of law pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**WHEREFORE,** Plaintiff respectfully prays that judgment be entered against Defendant for the following:

A. Actual damages in an amount to be determined by the jury; not less than $75,000;

B. Treble damages to be awarded to Plaintiff as and against the Defendants;

C. Consequential damages in the amount to be determined by the jury;

D. Punitive damages in the amount to be determined by the jury;

E. Exemplary relief in the amount to be determined by the jury;

F. Injunctive relief;

G. Costs and reasonable attorney's fees;

H. For such other and further relief as may be just and proper.

Dated: New York, NY
May 30, 2014

Respectfully submitted,

By:

Robert Garson (RG1521)
Garson, Ségal, Steinmetz & Fladgate
164 West 25th Street, Suite 11R
New York, NY 10001
212-380-3623
RG@GS2Law.com

30