UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| G31000 NORTH AMERICA, INC., ALLEN GLUCK , and ALEXIS DALI, | Civil Action No.: 14-CV-03885(VEC) |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| -against- | |
| | DEMAND FOR JURY TRIAL |
| CHRISTOPHER PARIS AND OXEBRIDGE QUALITY RESOURCES INTERNATIONAL, LLC. | |
| Defendants. | |

Plaintiffs G31000 North America, Inc., Allen Gluck, and Alexis Dali by and through their attorneys Garson, Ségal, Steinmetz, Fladgate LLP for their Complaint against Defendants, Christopher Paris and Oxebridge Quality International, LLC, on knowledge as to their own acts and otherwise on information and belief, state as follows:

## PRELIMINARY STATEMENT

1. This is an action for, *inter alia*, compensatory, declaratory and injunctive relief brought by Plaintiffs G31000 North America, Inc. ("G31000"), Allen Gluck ("Gluck"), and Alex Dali ("Dali" or "Alex") arising out of the unfair competition, tortious interference, trade libel, business torts and defamation by Christopher Paris ("Paris") and Oxebridge Quality Resources International, LLC, ("Oxebridge").

2. Plaintiffs are engaged in the risk management industry with a specific concentration in the ISO 31000 method, an international standard for risk management adopted as national risk management standard in the USA, as ANSI/ASSE/ISO 31000, whereas upon information and belief the Defendants consult primarily in ISO 9001 method, an

international management system standard for quality management that will require a risk management component in 2015.

3. At all times hereinafter mentioned, G31000, as a not for profit corporation, hosts conferences, coordinates educational programs, and participates in discussion forums raising awareness on the ISO 31000 standard.

4. Upon information and belief and at all times hereinafter-mentioned Paris both individually and through Oxebridge offers commercial consulting services based on the ISO9001 standards and other ISO management systems standards.

5. Both Plaintiffs and Defendants feature prominently in online industry chatrooms, blogs, discussion forums and websites that are focused on issues that impact the ISO standard industry including many that are publicly accessible without a subscription.

6. Upon information and belief the Defendants are publishers of an Internet website known as www.oxebridge.com (the "Oxebridge Site").

7. Defendants have taken a deliberate path to harm and disrupt the business of G31000 and its principals in various ways, such as:

    i)     Filing unfounded claims with the New York Attorney General;

    ii)     Directly contacting people with whom G31000 conducts business with the aim that such business be interrupted;

    iii)     Wrongfully orchestrating the interruption of G31000's main informational and advertising group on LinkedIn;

iv) Directly contacting Manhattanville College in New York on multiple occasions in order to have Gluck fired as professor;

v) Directly contacting Manhattanville College in New York to cause a fracture in its relationship with Dali;

vi) Harassing Manhattanville College causing it to renege on its agreement to sponsor the Third G31000 2014 International Conference (the "Conference");

vii) Threatening to place in jeopardy the careers of speakers engaged to appear at the Conference;

viii) Publishing false statements to the Oxebridge Site, alleging plagiarism, nefarious business practices and violations of FTC rules;

ix) Publishing false statements on LinkedIn, alleging plagiarism, nefarious business practices and violations of FTC rules;

x) Publishing false statements to Plaintiffs' business associates, partners, sponsors, and clients in order to either divert them from current or future business with Plaintiffs.

8. Despite knowing or being made aware that the statements are entirely false, Defendants have not retracted their statements or rectified the harm caused thereby.

9. Recently, Defendants also caused internationally recognized speakers to renege from their agreement to speak at the Conference, caused G31000 program participants from around the world to reconsider attending G31000 training sessions, caused conference attendees to reconsider coming to the G31000 annual conference, caused Dali to be

removed as a contributor to an industry publication and website, caused a G31000 director to resign, and caused government delegations to reconsider their affiliation with G31000.

10. The continuing and pervasive nature of Defendants' conduct demands injunctive relief to staunch the harm.

## PARTIES

11. Plaintiff G31000 is a not for profit corporation formed under the laws of New York with its principal place of business in New York State and is engaged in activity that affects interstate commerce.

12. Plaintiff Gluck is a resident of the State of New York, Rockland County and a Director of G31000.

13. Plaintiff Dali, is a citizen of Belgium, is resident in Marly-le-Roi near Paris, France and is a Director of G31000.

14. Upon information and belief, Defendant Paris, is a resident of the State of Florida, Polk County.

15. Upon information and belief, Defendant OxeBridge is a limited liability company formed under the laws of the State of Florida with its principal place of business in Hillsboro, Florida and is engaged in activity that affects interstate commerce.

18. Upon information and belief, Paris is the founder and chief executive officer of OxeBridge, and dominates and controls OxeBridge.

19. Upon information and belief, neither of the Defendants have any connection with the universities of Oxford or Cambridge as suggested by the name Oxebridge.

## JURISDICTION AND VENUE

17. This Court has original jurisdiction over Plaintiffs' federal unfair competition claim pursuant to 28 U.S.C. § 1121, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. In addition, there is complete diversity among the parties and jurisdiction is proper under 28 U.S.C. §1332. This action also seeks to collect for an amount exceeding $75,000 exclusive of interest, costs, or attorney's fees.

20. Plaintiff seeks Declaratory Relief and Injunctive Relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

21. This court has personal jurisdiction over Defendants under NY C.P.L.R. §302(a)(1) and §302(a)(3) because Defendants purposely avail themselves of doing business in New York, actively promote themselves to New York businesses, made multiple telephone calls to New York, sent emails directed to New York, published the defamatory material directed to New York as a competitor seeking to obtain a competitive advantage in New York against a New York individual and business, made complaints to the Attorney General of New York and committed harm within this judicial district. Plaintiffs were and will continue to be injured in the State of New York.

22. Defendants conduct business and state on the Oxebridge.com website that they service customers in New York including Jet Blue and L3 Communications both of which are headquartered in the state of New York.

23. Defendants further seek to market to a New York audience for the purpose of conducting business in New York, and have reached out recently to Plaintiffs to provide services in New York. There is a sufficiently substantial relationship between the defamatory statements and Defendants' New York activities as to warrant a finding of jurisdiction.

24. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiffs reside within this judicial district, and because a substantial part of the events and omissions giving rise to the claims occurred within this judicial district.

## STATEMENT OF FACTS

### ISO Standards at the core of both Plaintiffs and Defendants businesses.

25. Plaintiffs are engaged in educating the risk management industry for those who become knowledgeable in a particular standard for risk management known as ISO 31000:2009, which is a set of principles and guidelines for the risk management industry, adopted as national risk management standard in the USA, as ANSI/ASSE/ISO 31000.

26. ISO 31000 was formulated by the renowned International Standards Organization (ISO), which from its base in Geneva, Switzerland, has published over 19,000 international standards covering all aspects of business and technology across 162 countries.

27. ISO 31000 is a family of standards that was introduced to provide a universally recognized paradigm for risk management. ISO 31000:2009, Risk management – Principles and guidelines, provides principles, framework and a process for managing risk. It can be used by any organization regardless of its size, activity or sector.

28. The ISO 31000 standard intends to become the main reference for risk management for all ISO management systems standards that were being used by the relevant organization, including the ISO9001 quality management standard adopted by over one million companies, worldwide. ISO 31000 proposes to redefine the concept of risk to include positive outcomes. Defendants are mainly engaged with the ISO9001 quality management standard.

29. G31000 is dedicated to raising awareness on the ISO 31000 standard, organizes events for industry professionals in many different countries and offers its training programs to individuals, corporations and institutions both public and private.

30. G31000 has educated hundreds of individuals including government officials across the world and executives at large corporations, was well regarded in the industry and was poised to continue this success.

### The G31000 LinkedIn Forum

31. One of the core aspects of Plaintiffs' business has been the harnessing and utilization of business social media networking sites / applications such as LinkedIn.com. Over time, G31000 built a community of over 36,000 members, many of which engage on LinkedIn using the G31000 group multiple times a week.

32. The LinkedIn discussion forum is a key component of the Plaintiffs' business model as it provides a platform for interchange of ideas, marketing and promotion, sales of its services and a medium for an authoritative voice in the industry.

33. Both Dali and Gluck are not public figures nor have they sought to become public figures through the G31000 LinkedIn group or otherwise.

34. Paris was accepted to be part of the LinkedIn group and became a regular contributor to the threads or discussion topics, while at the same time raising his personal profile promoting Oxebridge.

## Paris is Moderated on LinkedIn.com and Sets out to Damage Plaintiffs

35. Upon information and belief, on or about February 23, 2014 Paris' contributions to one of the LinkedIn groups was considered by Dali, the moderator, to spread false information on the history of the ISO 31000 standard. After receiving a warning, Paris continued to spread additional false information, creating a controversy about the ISO 31000 standard among members. He was then placed under moderation after not responding to a request for explanation and to move a comment to the appropriate topic.

36. In umbrage, Defendants embarked upon a malicious campaign of tortious interference, unfair competition and defamation to harm Plaintiffs.

37. The course of conduct has been carried out with the explicit motive of imposing financial and professional harm on Plaintiffs.

38. After being moderated by Dali, Paris expressed his intentions in an email dated February 26, 2014 stating "Your comments to me were very expensive. You are just not bright enough to realize it." (Exhibit A).

39. Paris was bolder in further email on February 26, 2014 stating "I intend on making sure this costs you money." (Exhibit A).

40. Paris' emails continued "I have advised my aerospace client to seek Risk Management training from another provider. That just cost your, by my estimate, $67,500 in in-house training." (Exhibit B).

## The Course of Conduct Has Damaged and Continue to Cause Damage to Plaintiffs

41. Upon information and belief, Paris, both individually and through Oxebridge, has built a business out of criticizing others, and one of the targets are typically are those who educate in disciplines occupied by or close to those upon which the Defendants consult.

42. Upon information and belief, Defendants parasitically raise their own profile in search engine rankings by incorporating the publications about Plaintiffs and keywords related thereto specifically to benefit from searches by the public for Plaintiffs' business.

43. Upon information and belief, Paris also seeks to create the illusion of a third-party investigation (as it is one conducted by himself) into his targets so Defendants can then "report" that an investigation is underway against a presumably guilty party.

44. As noted below, upon information and belief, Defendants "report" on an "ongoing investigation" by the New York Attorney General, the FTC, and LinkedIn.com when he himself instigated the complaints to harm Plaintiffs.

45. The attacks have already caused damage to Plaintiffs as Defendants' attempts to harm are not limited to publishing libelous statements but also threatens the individuals and business around the Plaintiff with the aim of causing them to cut ties with the Plaintiffs.

**Paris causes LinkedIn to close the G31000, and Dali LinkedIn accounts**

46. Defendants first began their campaign against Plaintiffs by filing a complaint with professional social media network LinkedIn.com to disrupt one of the core aspects of Plaintiffs' business, namely the community of thousands of members in a G31000 LinkedIn forum.

47. The Plaintiffs have placed substantial resources into forming and maintaining a professional group on LinkedIn. To date, this group has attracted over 35,000 members and is an important part of Plaintiffs connection with the governments, businesses and individuals that seek to learn about ISO 31000, and to whom the Conference was promoted which was scheduled in New York on July 14-15, 2014.

48. Upon information and belief, Paris reached out to LinkedIn asking that Gluck's account be closed for alleged violations of the LinkedIn user agreement. On March 14, 2014 Gluck received the following message "We've recently identified suspicious activity in your LinkedIn account. It appears that you may be accessing multiple LinkedIn accounts and/or sharing access to your account. This activity is in violation of the LinkedIn User Agreement. ... As a result, we've suspended your account." (Exhibit C).

49. Further, as a result of Paris' requests to LinkedIn, Dali's personal LinkedIn account was suspended together with the G31000 LinkedIn group of over 35,000 active members.

50. After protesting to LinkedIn Customer Support, Dali's account was restored after 5 days and LinkedIn justified the drastic action by explaining "LinkedIn has received a claim that alleges infringing, inaccurate, or unlawful content on your profile (...) as your position at Formascope", a claim that Paris initiated based on false information. Paris maliciously presented the false information to LinkedIn and caused the group with its

public forums and Dali's account to be shut down for days, with no ability to post, market or respond to messages.

51. The G31000 LinkedIn group is a very active group with daily activity. As a result of Paris actions, numerous group members contacted Plaintiffs questioning their inability to post. Paris furthered the damage, by intentionally publishing libelous statements on multiple, and competing LinkedIn Forums for ISO 31000 urging members to join the competing group maintaining that "LinkedIn had removed the G31000 group" which is in fact the result of Defendants false claims to LinkedIn. These posts remain on LinkedIn and continue to damage Plaintiffs. (Exhibit D).

52. This is one instance where Defendants' "report" on an investigation against Plaintiffs is in fact an investigation Paris instigated based on false statements, in order to harm Plaintiffs. When the "investigation" is complete and access is restored, the damage is done. Defendants make no effort to fix their "reporting" that continues to harm, as intended by Defendants.

53. The G31000 LinkedIn group has since splintered into competing groups, many active posters are no longer participating and it may never be rebuilt.

54. As a result of Paris' actions, Plaintiffs Gluck and Dali were suspended from LinkedIn for five days, a significant period in the social media world, with resulting damage.

## Interfence withPlaintiffs' Relationships With Manhattanville College

55. Not content with disrupting G31000's business platform, Paris sought out Gluck's employer to have Gluck dismissed from his adjunct professor position at Manhattanville College, where Gluck teaches risk management.

56. When Gluck was not initially removed, Paris set his sights on publishing comments about Gluck's employer, effectively bullying Manhattanville College to comply with his demands under the threat of embarrassment of Manhattanville with false allegations.

57. Further, on or about March 15, 2014 Paris wrote to Manhattanville College stating; "Dr. Davidson, I am writing to report that Mr. Alex Dali, who is listed on the Executive Advisory Council for Manhattanville College's Education & Research Center for Managing Risk, has been found to have plagiarized a number of works. ... I believe you may want to reconsider your institution's affiliation with Mr. Dali." Dali strongly denies these demonstrably false allegations of plagiarism. Attached as Exhibit E is an email from the co-author of the article written by Dali, who initially wanted to list just Dali as the author, showing the falsity of the allegations. Paris was made aware of the collaboration on the article Exhibit F but chooses to ignore the facts and continue his libelous actions.

58. Upon information and belief, when Manhattanville College initially refused to disavow Messrs. Dali and Gluck, retaliation against Manhattanville by the Defendant was swift in coming on the Oxebridge website, including accusations that Manhattanville has financial interests in supporting the Plaintiffs and including the posting of a photo of the

Dean of the College with underlying accusatory statements that remain to this day. Exhibit G.

59. Upon information and belief, rather than fight and court controversy, Manhattanville College's Dean capitulated to Paris, and Gluck was constructively fired, i.e. his course for the next semester has been assigned to an instructor who has not yet taught this course, nor any course in Manhattanville College, and using the syllabus created by Mr. Gluck.

60. Mr. Gluck has undergone three student reviews of his course with results that were all stellar. An example review is attached as Exhibit H.

61. Without reason, Manhattanville College has also withdrawn from sponsoring Plaintiffs' conferences after having done so in 2012 and 2013.

62. Manhattanville College stated in response to inquiry from Gluck, regarding Dali's association with Manhattanville College "we do agree that it would be prudent for you to step down from your role as a member of the EAC at the Manhattanville Center for Managing Risk while your attention is directed towards resolving matters. I hope you agree and will do so voluntarily." Exhibit I.

63. The above message from Manhattanville College was a result of the Paris and Oxebridge's tortious interference, unfair competition, libel and smear campaign, and as a result of Paris reaching into New York to contact Manhattanville College.

## Paris' Targets G31000 Corporate Sponsors, Program Presenters, and Conferences Attendees

64. As part of their campaign, Defendants have directly and indirectly contacted Plaintiffs' customers, sponsors, affiliates, employees, potential customers, potential sponsors,

potential affiliates, and potential employees to spread false and defamatory information about Plaintiffs in an effort to harm Plaintiffs and raise the profile of Defendants' business.

65. In fact, all the inference and libel has caused many of Plaintiffs' program presenters to refuse to present in fear of harassment from Paris.

66. A further collateral result of Defendants' attacks have been the participants of Plaintiffs' conferences that were concerned with signing up for fear of being targeted personally.

67. Many conference attendees are public and government officials that are justifiably cautious to the potential for reputational harm that can be caused by Defendants to conference attendees simply for attending a conference presented by G31000. Plaintiffs have thus lost hundreds of thousands of dollars from a drop in conference attendance and sponsorship.

68. At the time of the original complaint in this action, Plaintiffs were concerned with publicizing the names of conference speakers and partners for the Conference, in order to protect them from Paris' propensity for unwarranted *ad hominem* attacks.

69. At least four of the Conference speakers withdrew or failed to commit because of a fear of reprisal from Paris, impacting upon the planning and marketing of the Conference.

70. A prime example being the attack on keynote speaker Dr. Karen Hardy and causing her to renege upon her agreement to present at the conference. Dr. Hardy was threatened in a posting on the Oxebridge site that her employment was at risk if she should present at the conference. The underlying theme of Paris falsely "reporting" to and threatening

people around the target that was effective against Gluck, made the threat all the more meaningful. Dr. Hardy specifically pointed to Defendants threats as the reason for breaking her agreement to speak at the conference.

71. Plaintiffs also present courses in ISO 31,000 around the world, including recently in Saudi Arabia, Italy, Switzerland, South Africa, China, United Kingdom, Belgium, United Arab Emirates, France, Spain and the USA. As a result of Defendants' course of conduct, attendance at these conferences has dropped by 75% or more.

72. Plaintiff Dali, is a contributor to the "Insurance Thought" website, where he publishes multiple articles referring to the ISO 31000 standard. After Defendants' libelous statements wrongly accusing plagiarism, Dali's articles were removed from the website and the website terminated its two year relationship with Dali.

73. In March 2014, a speaker at the Paris 2012 conference, told Dali that he can no longer speak at the Conference because of the liability created by Christopher Paris' smear campaign. He elaborated that in his position he could lose his job overnight if he were similarly besmirched.

74. A longtime G31000 sponsor withdrew after being made aware of the recent libelous statement by Defendants, that "my firm does not wish to continue as a partner ..."

75. A director of G31000 North America, Inc. submitted his resignation because of Paris' tortious campaign against G31000 "Alex, I have to say that this has really worried me and I have had a few sleepless nights ... or I feel that I will have little choice but to resign as I'm not in a position where I can cope with a significant financial or reputational hit."

76. As another example of the fear of reprisal, a government delegation requested assurances from Plaintiffs attorneys in stating "It is critical for the rumor to be nipped 'in the bud' formally and officially or it can cause severe embarrassment for the ... Government", "In order to ensure that the matter is being dealt with, may I ask that your attorney's (sic) provide official assurance in writing .... to the allegations raise on LinkedIn".

77. Paris is seeking to capitalize on the effects of his actions that seek to push down Plaintiffs to raise his own profile and clear the way for Defendant to provide "consulting services" to the same clients that became concerned about association with G31000 due to Defendants actions.

78. A third party informed Dali that Paris was seeking to capitalize on the effect of his campaign against Plaintiffs stating, "I have been copied into a number of e-mails that would seem to be pronouncing the death of G31000 and showing an almost indecent haste to step into the breach."

79. A partial list of libelous publications by Defendants is laid out below with reference to the place of publication.

80. On or about April 15, 2014, Paris posted variously "Dave, I have exposed the G31000 group as sketchy, not yet the entire ISO 31000 ecosystem. The standard itself isn't bad, it's origins are suspect and it's marketing is horrific, but the standard itself isn't terrible."

81. On or about April 15, 2014, Paris posted variously "G31000 Risk Management Group - Total Fraud?", "is a scam, operated by a charlatan". (Exhibit J).

82. On or about April 25, 2014, Paris posted variously within the ISO 31000 group "The
    G31000 scandal is becoming widely publicized.", "...and who lack true international
    industry support", Mr. Gluck's fearmongering, which attempts to sell his unaccredited
    risk manager certificates to the ignorant ISO 9000 crowd. The false subtext: 'if you don't
    get certified by us, you will fail your ISO 9001 audits.' Utter junk." "Handing the key to
    the drunk drivers at G31000 will ensure it's quick demise." (Exhibit K).

83. Similarly, Paris posted "If you are fine watching passively while your colleagues have
    their money stolen, then you are free to remain an observer. I am not fine with that, and
    elect instead to take action, at great cost to myself and my reputation." (Exhibit L).

84. On or about April 25, 2014, Paris posted variously "Update on G31000 LinkedIn group
    (closed)", "It appears the ... group ... was shut down by LinkedIn." "The group's moderator
    was reported for having at least one, if not two, fake profiles with false information and
    plagiarized publications. His account was deleted by LinkedIn, and it appears his group
    was cancelled with him." (Exhibit M).

85. On or about March 5, 2014, Paris posted on the Oxebridge Site "misleading or false
    credentials", "what appears to be outright, serial plagiarism", "many members who post
    are critical of the group", "The LinkedIn group has been the subject of much controversy,
    due to Mr. Dali's heavy-handed censorship of opposing opinions and banning of those that
    disagree with him, including at least one of his own moderators", "Searches resulted in no
    evidence that Mr. Dali has taught as a professor at any university", "his role in
    'publication of articles and books' is unclear to untrue", "Mr. Dali has never been

published by a third party, with one exception (as we will see)", "The ISBN number for his book on risk management for RIET Singapore comes up as 'not found'", "His ...PowerPoint presentation ... ISBN number comes up as 'not found' too", "Where he was published by a third party ... – it was plagiarized ... the piece was lifted in total from an article written by Francesca Broadbent ...", "The article ... includes entire sentences which are plagiarized from other works ...", "that Mr. Dali has not been published or recognized by any other major risk management association or trade publication is damning as to his credentials. Initial examination of Allen Gluck's experience with risk management appear to be shallow or nonexistent, with (so far) no verifiable credentials in the discipline." (Exhibit N).

86. On or about February 27, 2014, Paris posted "Alex Dali, the President of G31000 Global Institute for Risk Management, an international organization dedicated to cashing in on promoting the ISO 31000 risk management standard...", "G31000 offers \$2,700 a pop training classes on risk management, resulting in an unaccredited certification...", "Unable to provide any proof, the G31000 supporters and members instead resorted to their usual tack, of attacking the critic.", "I'm going with the sockpuppet theory, since that fits in with Mr. Dali's proven penchant for spam, exaggerated claims, aggressive salesmanship, and general lack of internet etiquette. " (Exhibit O).

87. On or about March 31, 2014, Paris posted variously "...our ongoing reporting has ... exploded his carefully-crafted façade that the organization is anything but a one-man pipe dream, propped up by exaggerated credentials and outright false claims. ... No one is doing due diligence to find out if these people have actual credentials or experience, and

are instead assuming as much based on nothing more than some well-designed pamphlets, and a cool, swishy logo." (Exhibit P).

88. On or about March 19, 2014, Paris posted variously "The non-vetting of quality professionals ... is toxic for the industry. Right now we see Boeing's Alan Daniels, ANAB's John Knappenberger and a host of other more serious professionals sucking up to the G31000 charlatans Alex Dali and Allen Gluck .... This means that they will have a foothold into future events, and be taken seriously, even though the G31000 group's marketing contains so much false information that they may well be in violation of FTC rules. Nobody vetted them!" (Exhibit Q).

89. On or about February 23, 2014 Paris posted "The notoriously oversensitive folks at G31000 and the ISO 31000 LinkedIn forum didn't take kindly to discussions of risk management, especially the parts where I asked for data or questioned the consensus process ..." (Exhibit R).

90. On or about April 2, 2014 Paris posted "The website for the G31000 Global Institute of Risk Management has been discovered to be harvesting content from its LinkedIn ISO 31000 discussion group, apparently without permission...", "G31000 appears to stand in multiple violations of the LinkedIn policies..." (Exhibit S).

91. On or about April 2, 2014 Paris posted on various sites "They have two employees, and no significant risk management experience. The only publications they have claimed authorship of were plagiarized. Nearly every one of their credentials was either exaggerated or entirely fabricated", "Now you can verify yourself, firsthand, the

plagiarized materials from Alex Dali's profile. How dandy." , "Mr. Gluck (whose real name is Avrohom Meir Gluck)", "None of the ISBN numbers listed for his publication actually exist", "At least two of the 'partners' listed on the G31000 site never agreed to be listed, and one of those has asked to be removed, and Mr. Dali has refused. This includes Coherent Advice and CRI.", "Due to irregularities, the entire profile for Mr. Dali and his risk center at Manhattanville College has been taken down, upon investigation by the college's President. That page, too, listed a number of 'advisory council' members that were not actually members, along with false claims under Mr. Dali's biography.", "Mr. Gluck's previous employment contains, at first glance anyway, no experience whatsoever in risk management, but a history of connections with companies that failed in spectacular manner: MallCall International and Neuromedical Systems as two examples. Previous to that he worked for a now-defunct web design company. Meanwhile, his resume claims only '27 years adult education' which would appear to be entirely inaccurate." (Exhibit T).

92. On or about May 14, 2014 Paris posted on the Oxebridge site, "Alex Dali is an overflowing font of ridiculousness", "G31000, meanwhile, has no minimum requirements of its attendees", "It also markets its exams as easy", "pushing the idea that it strives to help attendees pass the exam, rather than objectively assess them", "with an additional (undisclosed) exam fee to become a certified "trainer"." "two G31000-branded classes per year, without the financial help or investment of the G31000 group", "Mr. Dali, who (according to reports) flies first class international from France", "cash flows as unethical, rife with conflicts of interest and potentially illegal?" (Exhibit U).

## The Statements by Paris and Oxebridge are False

93. Defendant's accusations noted above are false. Had Defendant made even the slightest attempt to carefully read the publicly available information as opposed to surmising and creating untruths, they would have known there was no basis for the allegation.

94. Despite notification and many opportunities, Defendant did not publish a retraction or correction.

95. In addition to the publishing on Defendant's website, the vitriol has spread to other websites as well. (Exhibit V).

96. When Paris is informed that he has posted false information, he simply responds, "Please be aware that we cannot know everything about everything before posting. So mistakes will slip through. You shouldn't attribute that to some nefarious scheme to 'sharing false information.' Consider it... a 'risk' of operating in a public forum. Risks are inevitable, after all ... or so I am told."

97. Defendant's website and LinkedIn posts remain online and his publications remain available to this day.

98. Defendants' conduct is malicious, intentional, wanton, and reckless, and represents a conscious and total disregard for Plaintiffs' rights. Defendants' conduct caused, and continues to cause, Plaintiffs to be seriously damaged.

99. The allegations -while not formally a crime- are in the public eye considered such egregious moral and ethical violations as to constitute libel per se.

100.    There is no public interest in the lies spread by Defendant.

101.     Plaintiffs have no choice but to request relief from this honorable court.

102.     Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

## CLAIMS FOR RELIEF

### COUNT I - 15 U.S.C §1125

103.     Upon information and belief, Defendants caused to be published on the Oxebridge site, and write directly to Plaintiffs business relations, statements likely to deceive mislead or confuse business partners and customers of Plaintiffs.

104.     Upon information and belief, Defendants caused to be published on the Oxebridge site, and wrote directly to Plaintiffs business relations, statements about Plaintiffs that are false and misleading.

105.     In addition, Defendants caused these statements to be republished to Plaintiffs' clients and prospective clients.

106.     Plaintiffs have been seriously damaged as a direct and proximate cause of these acts by Defendants, including lost business earnings, affiliations, and spoilage of relationships with third parties.

107.     This conduct violates §43(a) of the Lanham Act, 15 U. S.C. §1125 and Plaintiffs have suffered general and special damages in an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00), injunctive relief and attorneys' fees.

### COUNT II - Intentional Interference with Prospective Economic Relations

108.    Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

109.    An economic relationship existed between Plaintiffs and third parties that would have resulted in an economic benefit to Plaintiffs from business related to consulting, conferences, speaking engagements.

110.    Defendants knew of the relationships.

111.    Defendants intended to disrupt the relationships by his aforementioned defamation.

112.    The economic relationships between Plaintiffs and third parties were disrupted.

113.    Defendants' wrongful conduct was a substantial factor in causing Plaintiffs' harm.


## COUNT III - Negligent Interference With Prospective Economic Relations

114.    Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

115.    An economic relationship existed between Plaintiffs and third parties that probably would have resulted in a future economic benefit to Plaintiffs via payment of proceeds from business related to consulting, conferences, educational programs, and speaking engagements.

116.    Defendants should have known of these relationships.

117.    Defendants should have known that these relationships would be disrupted if he failed to act with reasonable care.

118.    Defendants failed to act with reasonable care when they engaged in wrongful conduct through defamation.

119.    The economic relationships between Plaintiffs and third parties were disrupted.

120.    Defendants' wrongful conduct was a substantial factor in causing Plaintiffs' harm.

## COUNT IV - Defamation

121.    The Defendants maliciously defamed the Plaintiffs by his knowing publication to third-parties reports containing the fraudulent and false information.

122.    Defendants had actual knowledge of the false, inaccurate, and misleading nature of such information and published it despite having such knowledge.

123.    The Defendants actual knowledge of the falsity and reckless disregard for the truth demonstrates the malice and/or willful intent to injure the Plaintiffs.

124.    As a direct and proximate result of the above-described conduct by Defendants, Plaintiffs have suffered general and special damages in an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00), including without limitation, damage to Plaintiffs' reputations, careers, and standing in the international business community.

125.    Upon information and belief, Defendants' conduct was done with oppression, fraud, and malice and that, therefore, the conduct of Defendants justifies an award of punitive and exemplary damages.

126.    Upon information and belief, that unless enjoined and restrained by the Court, Defendants will republish, repeat, and continue to disseminate defamatory statements,

all to the continuing injury of Plaintiffs; that such continued republication, repetition, and dissemination of the defamatory and offensive falsehoods will cause irreparable harm to Plaintiffs by further damaging their reputation and adversely affecting their careers and business efforts as well as their personal relationships.

127.     Upon information and belief, Plaintiffs lack an adequate remedy at law insofar as damages will be very difficult to calculate for such on-going injuries. By reason of the foregoing, Plaintiffs are entitled to a permanent injunction enjoining and restraining Defendants, and all persons acting in concert with them, from republishing, repeating, distributing, or otherwise disseminating the accusations of plagiarism to the extent such are found by this Court to be false.

### COUNT V - Common Law Trade Libel or Injurious Falsehood

128.     Plaintiffs repeat and reallege each paragraph above as if set forth fully herein.

129.     As described herein, Defendants have published false, defamatory, and disparaging information about Plaintiffs and their business practices.

130.     Defendants' false, defamatory, and disparaging statements were made with actual malice, with reckless negligence, or with reckless disregard of Plaintiffs' rights,

131.     Defendants had no privilege, right, or justifiable cause to publish such statements.

132.     Under these circumstances and as a result of Defendants' conduct, a reasonable person would foresee that third parties, i.e., customers, suppliers, affiliates, employees, potential customers, potential suppliers, potential affiliates, and potential employees,

would be deterred from establishing business relationships with, affiliating with, or seeking employment from Plaintiffs or continuing existing relationships with Plaintiffs.

133.     The information published by Defendants has played a substantial and material role in inducing individuals not to establish business relationships with, affiliate with, or seek employment from Plaintiffs.

134.     Plaintiffs have been seriously damaged as a direct and proximate cause of these acts by Defendants, including lost business earnings, donations, affiliations, and spoilage of relationships with employees.

## DEMAND FOR INJUNCTIVE RELIEF

135.     Plaintiffs request and order granting preliminary and permanent injunctive relief against Defendants, and their agents, servants, and employees, and against any and all persons, firms, or corporations with whom Defendants have acted in concert who receive actual notice of the order by personal service or otherwise, enjoining them from directly or indirectly engaging in any of the illegal, unauthorized, and wrongful acts complained of herein and granting such other injunctive relief which the circumstances may require in order to protect Plaintiffs' interests including:

a) Removal of existing publications.

b) Prominent recanting / correction of all false publications.

## PUNITIVE DAMAGES AGAINST DEFENDANTS

136.     Plaintiffs will show that the acts and/or omissions of Defendants were committed with malice or reckless indifference to the protected rights of the Plaintiff. In order to

punish Defendant for engaging in unlawful business practices, and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery from Defendant for punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiffs, by and through their undersigned Counsel, hereby demands a trial by jury of all issues so triable as a matter of law pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**WHEREFORE,** Plaintiff respectfully prays that judgment be entered against Defendant for the following:

    A. Actual damages in an amount to be determined by the jury; not less than $75,000;

    B. Treble damages to be awarded to Plaintiff as and against the Defendants;

    C. Consequential damages in the amount to be determined by the jury;

    D. Punitive damages in the amount to be determined by the jury;

    E. Exemplary relief in the amount to be determined by the jury;

    F. Injunctive relief;

    G. Costs and reasonable attorney's fees;

    H. For such other and further relief as may be just and proper.

Dated: New York, NY
August 1, 2014

Respectfully submitted

By: _____
Robert Garson (RG-1521)
Michael Steinmetz (MS-3164)
Garson, Ségal, Steinmetz, Fladgate LLP
164 West 25th Street, Suite 11R
New York, NY 10001
212-380-3623
rg@gs2law.com
ms@gs2law.com